(No. 20134.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN PRESTON, Plaintiff in Error.

*Opinion filed October 25, 1930—Rehearing denied Dec. 6, 1930.*

Eugene L. McGarry, and Edgar J. Elliott, for plaintiff in error.

Oscar E. Carlstrom, Attorney General, C. W. Reed, State's Attorney, and George P. O'Brien, (Win G. Knoch, and R. W. Keeney, of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, John Preston, (hereinafter called the defendant,) was indicted at the October, 1929, term of the circuit court of DuPage county for the murder of Agnes Johnston and was convicted by a jury on December 12, 1929, the jury fixing his punishment at death. Motion for a new trial was overruled on January 31, 1930, sentence pronounced in accordance with the verdict and execution set for February 19, 1930. He brought his case to this court for review at the June term, 1930.

The evidence showed that the defendant, a married man, a painter by occupation, while working in the offices of Libby, McNeill & Libby at the Union Stock Yards about October 7, 1929, became acquainted with Miss Mathilda Murphy and Miss Agnes Johnston, also employed there. He told Miss Murphy to get Miss Johnston some night and he would get a fellow to go out on a "date" with them. Miss Murphy saw Miss Johnston and arranged for the defendant and another man to take the two girls out to dinner. On the following Saturday afternoon, according to the testimony of Miss Murphy, the defendant called her on the telephone and said he could not get the fellow to go along with them, but as long as he had made the date for Saturday night he did not wish to disappoint Miss Johnston, so they would take her along anyway and keep the date. He said they would go out and get dinner. He called for Miss Murphy in a Chrysler sedan and they in time called for Miss Johnston at her home. All three sat in the front seat, Miss Murphy on the right of the defendant and Miss Johnston on the outside, to the right of Miss Murphy. He said they would go out to West Chicago, which was about an hour's ride. It appears that he previously had called up Hansen's resort, near West Chicago, and had arranged for a party of four or six for supper. On the way out he stopped and drank out of a bottle and took some pop afterwards. When they arrived at Hansen's

he ordered a steak dinner and they had some beer. During the meal he jumped up and said, "Beer for everybody in the place!" The girls became frightened and inquired as to means of getting home, as it was getting late. After talking to the defendant about it getting late he bought some Dutch Master cigars and all three of them got into the car, their positions the same as before. When they started out from Hansen's the defendant said, "We are going through West Chicago home, because I want to show you the standpipe that I painted out there." They traveled over a gravel road, the defendant driving at a fast pace until told by the girls not to drive so fast. He turned off on a side road and suddenly stopped the car and made indecent proposals to the girls. Miss Johnston opened the door, jumped out of the car and started to run down the road. Miss Murphy followed a few feet after and the defendant came running up to her. She said: "For God's sake, be a man; you know we are decent; leave us alone; we will walk home." With that he struck her in the mouth and she fell to the ground. She heard Miss Johnston calling, "Til! Til!" two or three times, and lifting her head she saw the defendant with his arm around the waist of Miss Johnston, lifting her into the car. She ran after the car until she came to a farmhouse, where there were some dogs barking and jumping on the fence, which frightened her. She went back to the railroad track and flagged a train, telling the men what had happened, and the train crew took her to Wheaton.

On Sunday morning October 13, 1929, Clinton Ketcham, Charles Mathews and Adolph Hensel, while out hunting mushrooms, stopped behind a Chrysler sedan parked in the road outside the town of West Chicago, in DuPage county. Ketcham examined the car, and having heard from officer Phillips that he was looking for a car such as this one, drove back to West Chicago and got Phillips, who

brought his police dog with him to where the car was stand-
ing. The dog ran to the roadside, and, following it, these
men discovered the partly nude body of a woman covered
with grass but with feet protruding. Phillips went back
and got coroner Isherwood, who ordered the body taken to
an undertaking establishment at West Chicago, where he
made an examination of the physical condition of the body
but did not make a post-mortem examination or autopsy.
He stated in his opinion the young woman came to her
death by means of suffocation or strangulation.

Belden Thompson, a conductor on the Chicago, Aurora
and Elgin railroad, testified that about 2:55 A. M. on Oc-
tober 13 he picked up a passenger at Maple street, West
Chicago, whom he identified as the defendant. He stated
that the defendant told him he had been held up; that he
had been out to a roadhouse, drinking, and had bought
several rounds; that there were two strangers there, shab-
bily dressed, who noticed that he had a considerable amount
of money with him; that when he started to leave they
followed him, drove him to one side of the road and took
$65 from him and his new Chrysler car, which had only
gone 200 miles; that two girls were with him, and the last
thing he knew he saw one girl running down the road and
the other girl was still in the machine; that they hit him
in the mouth and knocked him out; that he rode this train
to Wheaton, where he had to change cars for Chicago. The
witness said that the defendant wore a light hat that had
considerable amount of blood over it. His shirt sleeves
extended up over his coat and were all covered with blood.
He had a cut across his fingers, which he said was where
he was shot,—quite an open wound,—and had a cut across
his face, where he had been hit by the hold-up men. The
witness reported to the police at Wheaton that a man was
on the east-bound train with blood on his clothing, and
the defendant was taken into custody at Forest Park by

the chief of police, who later turned him over to sheriff Hattendorf, of DuPage county.

Dillard Dunfee, a cook in the Douglas restaurant at West Chicago, testified he had seen the defendant during the summer; that about 1:30 A. M. October 13 the defendant came to the restaurant and called him out of the kitchen; that he had blood on his hat, on the sleeve of his shirt and on his face, and his hand was cut—cut bad; that the blood on his hands, he explained, was caused by getting hurt in a hold-up, which took place north of West Chicago and in which they took $60 or $65 away from him; that the defendant asked him to call Lefty Flynn and have him come and get him, and he called Flynn for him.

Cecil Flynn, otherwise called "Lefty," an attendant at the service station and lunch room of Charles Hansen, corroborated Miss Murphy regarding the movements of the defendant and the two girls while at Hansen's place and saw them leave. He further testified that the defendant called him about 1:30 A. M. and asked him to come out to West Chicago and get him; that he had been "hijacked" and shot in the hand; that he met the defendant at the Douglas restaurant; that the defendant's hand was bloody and was torn or split between the little finger and the ring finger; that he asked the defendant where his car was, and he told him it was out in the "sticks;" that Miss Hansen and others were with witness, and she asked the defendant where the girls were, and he told her they were with the car; that he drove the defendant to the Maple street station, where he saw him get on the train towards Wheaton.

Deputy sheriff Ed Lang testified that while patrolling the highways on Sunday, October 13, on a road about a quarter of a mile from the Elgin, Joliet and Eastern railroad tracks, he found four Dutch Master cigars wrapped in tin foil, one of which was broken. He saw three patches of blood on the road on the east side and found a lady's felt hat in the ditch, also a handkerchief, both of which

he put in his car. On further investigation he found some foot-marks and a large pool of blood about eight inches in diameter. He later turned the hat and handkerchief over to sheriff Hattendorf.

Sheriff Lawrence Hattendorf testified that he examined the ground about a quarter of a mile east of the Elgin, Joliet and Eastern railroad tracks and found shoe-prints of a lady's heel and a large blood spot in the road, six or eight inches in diameter, and another blood spot twenty-five or thirty feet to the west. The defendant was turned over to witness, who removed his hat, shirt and under-clothing, all of which were admitted into evidence without objection.

Louis Zizra testified that he was hunting mushrooms in DuPage county on Sunday, October 13, about 8:30 A. M., and that on the road, about two miles northwest of West Chicago, he found a pair of white gloves, which he turned over to sheriff Hattendorf. These gloves, the hat and handkerchief found by Ed Lang and the articles of clothing taken from the body of the deceased were all stated by Miss Murphy to belong to the deceased.

After his arrest the defendant made a statement on Sunday afternoon and another statement on Monday morning, which were in conflict with each other. In the statement on Monday, as testified to by Dr. Isherwood and sheriff Hattendorf, he admitted attacking Miss Johnston and choking her to prevent her screaming.

The defendant testified in his own behalf, and his testimony coincides with that of Miss Murphy as to their meeting and the trip out to Hansen's as well as to their movements and conduct while there. He stated he had not any idea when he left there and did not know where he went from there; that the next thing he knew was finding himself on a freight train on the outskirts of West Chicago. He asked the engineer where he was, and he was told that he was in West Chicago. He went to the restaurant and

talked to the cook and had him call up Flynn. Flynn and his friends came down and he talked to him and later got on the electric car. He was awakened by the police in Forest Park. He testified that he had been in St. Luke's Hospital, Chicago, in September, 1929, for treatment for self-inflicted wounds on the wrists and throat and drinking iodine, having been taken there by the Chicago police. On cross-examination he was asked if he made certain answers to questions put to him by the coroner—that is, if he remembered being asked those questions and having made the answers repeated by the State's attorney. In nearly every case he answered, "I don't remember," or "I do not recall," or "I can't say as I do," but in no case did he deny that the question was asked or the answer given. He did not deny that he assaulted and choked the deceased, but stated that he did not remember anything from the time he started to leave Hansen's place until he came to on the freight train. He remembered some of the events that were testified to by witnesses for the State but not all of them, and did not deny those that he did not remember.

John Griggs, a friend of the defendant for about seven years, testified that about six months before the trial, while visiting at his home, the defendant drank some whisky, whereupon he suddenly jumped up and tried to jump out of the window and was restrained by the witness.

Mrs. Mary Preston, the mother of the defendant, testified that an uncle of hers on her mother's side suffered from a mental ailment and died in the asylum about eleven years ago.

In rebuttal the State called J. W. Hollinger, official court reporter of DuPage county. From his notes a long list of questions, and answers in response to the questions, were read to him by the State's attorney, and the witness stated that those questions were asked the defendant on Monday, October 14, and that he made the answers read by the State's attorney. In his statement defendant said that

no promises or threats were made, there was no abuse, and that he was warned that anything he said might be used against him. He then said that on Saturday, the 12th, he had been with Agnes Johnston and Mathilda Murphy; that he had taken them to Hansen's Grove, north and west of West Chicago; that he had intercourse with the decedent; that she screamed, and he drove the car on further, took her out of the car and again had intercourse with her; that she screamed there and he choked her to stop the screaming. After he had finished the act of intercourse she did not scream or make any noise, and that he covered her with grass so her body would not be discovered.

The coroner testified that his examination of the body disclosed that the head was markedly congested, filled with blood and very much discolored. The lips were swollen, the tongue protruding. The eyes were congested with blood—that is, the whites of the eyes had ruptured blood vessels so that they were full of free blood. There were two sets of teeth-marks about a third of the way between the knee and the hip on the front of the left thigh. The right breast showed one set of teeth-marks, and there was what is known as a third degree laceration of the perineum, or that portion of the body between the rear of the vagina and the anus. The perineum was torn through from the vagina into the rectum. From that lacertation there would be a considerable quantity of blood. There were blue marks about the neck, pretty well spotted, half an inch in diameter.

It is contended by plaintiff in error that the evidence does not show, as alleged in the indictment, that Agnes Johnston was murdered, and that there is no evidence that the body found by the roadside was that of Agnes Johnston. It is true that no person who saw the body by the roadside had previously known or seen Agnes Johnston and that no person directly testified that the body found there was the same as that identified the next day at the undertaking establishment as that of Agnes Johnston. The cloth-

ing found at the scene of the crime was identified as that of Agnes Johnston, and from the circumstances detailed above there can be no reasonable doubt from the evidence that the body found by the roadside was that of Agnes Johnston.

It is claimed by defendant that he was compelled to furnish evidence against himself; that on Sunday he was searched by the sheriff and the articles of clothing which were introduced in evidence were seized and taken from him by the sheriff in violation of his constitutional rights, and that such articles were therefore incompetent as evidence. On Sunday afternoon, while in the presence of the sheriff, deputy sheriff, assistant State's attorney and coroner, defendant was asked to let down his trousers and expose his underwear. This he did, and his shirt and underclothes, as stated by the coroner, "were all stained in front." The coroner testified that he made an examination of the stains by the Benzadine test two days previous to his testifying and that such examination showed these stains were blood. After defendant was taken to the jail his stained clothing was removed and kept by the sheriff in its then condition until the time of the trial, except a portion taken and analyzed for blood. At the beginning of the interview the defendant was informed that anything he said might be used against him and that it was not compulsory for him to say anything; that they were not forcing him in any manner. The right to be secure in person and effects against unreasonable search and seizure is not one of those constitutional rights which cannot be waived. Where a person consents to the search of his person and the taking of his property he thereby waives his constitutional right in that respect and cannot be heard to complain that such search and seizure were in violation thereof. The guaranty of the constitution is not against all search and seizure but against unreasonable search and seizure and does not extend to an immunity from search and seizure on arrest. The

rule laid down in the cases is, that generally where an arrest is made by an officer who has reasonable ground for believing the person arrested is implicated in the crime such officer has a right to search the person arrested without a search warrant, and that in such case the right of search and seizure is incidental to the right to arrest. (*People* v. *Reid,* 336 Ill. 421; *North* v. *People,* 139 id. 81; *People* v. *Hord,* 329 id. 117.) The evidence as to the blood stains and the introduction in evidence of the articles of defendant's clothing was not in derogation of his constitutional rights.

It is also claimed that the evidence of the coroner as to the result of the test he made of the stains on defendant's clothing was incompetent, for the reason that it was made two months after the commission of the crime. The testimony showed that the stains examined were in the same condition as on October 13. The length of time would not affect the competency of the evidence but only its weight.

Witnesses who were at the scene of the crime the next morning testified to finding blood stains on the car and blood on the grass on the roadside near where the body was found. It is claimed that this evidence was incompetent as being the conclusions of non-expert witnesses. The existence of blood in large quantities, where the stains are recent and marked, may be distinguished by most persons, and while it is more difficult to discover the character of a few drops or a smaller quantity, it does not necessarily follow that non-experts cannot testify to its reality as a matter of fact. (*Greenfield* v. *People,* 85 N. Y. 75.) It was for the jury to determine the weight to be given to the testimony. *People* v. *Korak,* 303 Ill. 438.

It is claimed that the court allowed many leading questions, and that the court should not have allowed the same even though counsel for defendant, through inexperience, failed to object to the same. A perusal of the record discloses that leading questions were indulged in to some ex-

tent by counsel for both sides. The specific instances cited by counsel in their brief and argument wherein leading questions were asked by counsel for the People were not of such a character that defendant could have been prejudiced thereby. In many cases they were merely introductory and related to immaterial matters. In others they directed the attention of witnesses to the subject matter of the inquiry or refreshed the recollection of witnesses relating to narrative form. In none of the instances cited did they refer to matters denied by defendant or as to which there was any conflict in the testimony, except as concerned the admissions made by defendant in the State's attorney's office on the first and second days following the homicide and to which defendant testified that he did not remember the questions he had been asked or the answers he had made. The testimony of witness Hollinger, the court reporter, as to the actual questions asked and the answers given, was introduced for the purpose of impeachment, and of necessity the questions to him had to have incorporated therein the exact language of the alleged statement of defendant as to which he was interrogated in his cross-examination when the foundation for the impeaching testimony was laid. Undoubtedly many leading questions were asked to which objections would have been sustained had they been interposed. Sustained objections to these questions would have resulted in undue waste of valuable time of court, counsel and jury and have served no good purpose.

Defendant on direct examination testified that he had no idea when he left Hansen's and did not know where he went when he left there; that the next thing he knew after that was finding himself on the freight train on the outskirts of West Chicago. During the cross-examination of the defendant he was asked questions regarding his statements alleged to have been made to the coroner on October 13 and 14. The questions and answers occupy many pages of the abstract and it is impossible to set them out

in detail. He did not deny that the questions were asked him and that he made answer as indicated by the State's attorney in his interrogatories, but in each instance his answers were evasive, such as, "Not to my knowledge," "I don't remember," "I can't say as I remember." Where a witness, when asked as to the making of statements inconsistent or at variance with his testimony, neither directly admits nor denies the making of such statements but states that he does not know or recollect, or gives any other answer not amounting to an admission, it is competent to prove the affirmative by way of impeachment. *Bressler* v. *People,* 117 Ill. 422; *Wood* v. *Shaw,* 48 id. 273; *Ray* v. *Bell,* 24 id. 444.

On the trial, in his closing argument to the jury, in reply to the argument of defendant's counsel as to the legal effects of intoxication and insanity as a defense for crime, the assistant State's attorney read to the jury portions of the opinions of this court in *People* v. *Geary,* 297 Ill. 608, and *People* v. *Brislane,* 295 id. 241. It is claimed by defendant that this was reversible error, and he cites *People* v. *Krauser,* 315 Ill. 485, and *People* v. *Rees,* 268 id. 585, in support of his contention. Those cases differ from the instant one. In the *Krauser case* it was held that where the defense of insanity is interposed it is error to read in argument to the jury a portion of an opinion in a reported case, consisting not of a statement or proposition of law but merely of a quotation from the testimony of an expert in the case reported ridiculing the system of examination of the defendant, which was the same system that was used by the experts in determining the sanity of the accused in the case at bar. In the *Rees case,* which was a prosecution for burning insured goods, where one of the defendants, who was not, however, on trial, was an insurance adjuster, who was charged with arranging with the defendant on trial to cause the fire, it was held prejudicial error to permit the assistant State's attorney to read facts from the reported

opinion in another case with which the defendant on trial was not connected, showing that the adjuster had been guilty of arranging for a fire in that case. In the instant case neither situation arises. As the jury in criminal cases are by our statute made judges of the law, the principles of law involved in a case may be discussed in the arguments to the jury, and the law as laid down by standard authors and as contained in the reported cases of courts of last resort may be read to the jury by either side, including enough of the ultimate facts to enable the jury to understand how the law is applied and to at least semi-intelligently perform the judicial functions imposed on the jury by statute. (*People* v. *Spaulding,* 309 Ill. 292; *People* v. *Osborne,* 278 id. 104; *People* v. *Rees, supra; Wohlford* v. *People,* 148 Ill. 296.) In the instant case not all of the facts in the opinion were read, but only sufficient to show the issues of facts there raised and the application of the law thereto. The inhibition is not against reading facts at all, but only against reading such facts as might have an evidentiary bearing on the issues on the present trial and against reading such facts as have no relevancy to the legal questions involved in the case on trial.

It is contended by defendant that the court erred in giving two instructions on the subject of manslaughter. It is true that if the evidence in a criminal case admits of but one conclusion, which is that the accused, if guilty at all, is guilty of the crime charged, it is error to give an instruction authorizing a conviction for a lesser offense, (*People* v. *White,* 311 Ill. 356; *People* v. *Moore,* 276 id. 392; *People* v. *Schultz,* 267 id. 147;) yet in the instant case there was one portion of defendant's evidence which, had the jury believed it, (as they evidently did not,) would have authorized a verdict of guilty of manslaughter. An instruction which correctly states the law and is based on competent evidence in the case is not erroneous even though it is not in consonance with the theories of either party.

(*People* v. *Scalisi,* 324 Ill. 131.) It is evident that the reasons assigned in the case cited for holding a manslaughter instruction erroneous do not here apply, as the verdict was not a compromise one but was for murder, fixing the extreme penalty of the law.

It is claimed that the court erred in the matter of giving and refusing instructions. Without going into the details of each instruction, suffice it to say that the jury were fully and fairly instructed as to the law applicable to the case, and that the instructions on the subject of intoxication and insanity as a defense were in accordance with the principles laid down in *People* v. *Krauser, supra, People* v. *Cochran,* 313 Ill. 508, and *People* v. *Lowhone, 292* id. 32.

It is claimed by defendant that the assistant State's attorneys were guilty of misconduct in making inflammatory arguments and appeals to the passion and prejudice of the jury. The crime committed was a most atrocious and bestial one. It called for a strong and vigorous prosecution, and was a case where a prosecutor was liable to be betrayed by his feeling of indignation, aroused by the evidence, into invective and bitter denunciation. We are of the opinion that the assistant State's attorneys were not guilty of misconduct warranting a reversal of the case. It is not improper for a prosecuting attorney to reflect unfavorably on the defendant or to denounce his wickedness, and even indulge in invective within the limits of propriety, if based on evidence competent and pertinent to be decided by the jury. *People* v. *Spaulding, supra; People* v. *Lloyd,* 304 Ill. 23.

A motion for a new trial was filed after counsel who now appear for defendant had come into the case, one of the reasons for a new trial assigned being the inexperience and incompetency of Edgar J. Elliott, the attorney who conducted the defense on the trial, and Elliott's affidavit was filed in support thereof. In this affidavit Elliott stated that he had been engaged in the active practice of law in this

State for the past fifteen years, and that such practice had been limited, with a single exception, to matters concerned with civil cases exclusively; that, with such exception, he had never engaged in the defense of a criminal, and that he was almost totally ignorant of and unfamiliar with the rules of criminal procedure and practice; that on October 18, 1929, he was appointed by Judge Newhall, who was not the trial judge, to represent the defendant; that he made such preparation as he believed proper and sufficient for defendant's defense; that being unfamiliar with the rules of admissibility of evidence in criminal cases he permitted the introduction of certain evidence on the trial without objection, (specifying such evidence,) and that he has since learned that objection should have been made to all of the same. In his affidavit he further points out other omissions on his part, said to be due to his ignorance of the rules of criminal procedure, in the matter of failing to make objections and failing to present instructions upon certain specified subjects.

As to Elliott's alleged delinquency in the matter of failure to tender instructions, from an inspection of the given instructions we are of the opinion that had instructions been tendered on the subject specified in the affidavit they could properly have been refused for the reason that the law on the subject was fully directly covered by given instructions, with the exception of one to the effect that the indictment was no evidence of guilt, and that was indirectly covered by instructions that "it is the duty of the jury to find and determine the facts in this case from the evidence," and "in your deliberation you should not be influenced by anything other than the law and the evidence in the case." As to the failure of Elliott to interpose objections, we are of the opinion that practically all of them would have been overruled if interposed, and that Elliott's failure to interpose the specified objections might as well be attributed to his judgment on the question of propriety and expediency

as to his inexperience and incompetency. Elliott had been in active practice for fifteen years. His ability, experience and standing as a lawyer were known to the judges of the court. He was appointed to defend, as shown by the record, by Judge Newhall after consultation with his associate, Judge Fulton, before whom the case was tried. In deciding upon this question, as shown by the record, the trial judge said: "I have known Mr. Elliott for some time, known something about his practice and know that he defended a man accused of murder here last Spring, and I know that he is regarded as a reputable, dependable, substantial lawyer. * * * To my knowledge Mr. Elliott looked after the case in a lawyer-like manner. He probably did not try it as some other criminal lawyer might try it, but I don't know that any of the constitutional rights of the defendant were jeopardized in the trial of the case. He conducted it in a gentlemanly and lawyer-like manner."

It is true that Elliott did not try the case as many other criminal lawyers might have done. The record is remarkably free from the brow-beating of witnesses, extended purposeless cross-examination of witnesses and constant bickering between attorneys which characterize so many criminal trials, tending to a useless waste of time and disgusting to courts, juries and courts of review. Elliott took no chances of educing facts unfavorable to his defenses of intoxication and insanity by much cross-examination of the witnesses who saw and talked with defendant just before and after the commission of the crime. He merely got enough evidence into the record to serve as a basis for these defenses without apprising counsel for the State as to what his defenses were until his argument to the jury, when it was too late for the State to call witnesses in rebuttal on these subjects. It was a desperate case for any attorney for the defense. His only possible chance lay in gaining the confidence and respect of the jury by fairness and candor and so possibly winning their verdict by

belief in his arguments. The defendant was ably defended, he had a fair and impartial trial, and the verdict was the only one which the jury could reasonably have rendered.

The judgment of the circuit court is therefore affirmed, and the clerk of this court is directed to enter an order fixing December 12, 1930, as the date on which the original sentence entered in the circuit court of DuPage county shall be executed. A certified copy of the order shall be furnished by the clerk of this court to the sheriff of DuPage county.

*Judgment affirmed.*