## MOXLEY *v.* STATE
[No. 20, October Term, 1954.]

508

*Decided November 19, 1954.*

The cause was argued before BRUNE, C. J., and DELA- PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*C. Orman Manahan* for the appellant.

*Ambrose T. Hartman, Assistant Attorney General,* with whom were *Edward D. E. Rollins, Attorney General,* and *Daniel M. Murray, Jr., State's Attorney for Howard County,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment and sentence on the charges of assault with intent to murder and common assault. The case was tried before the trial judge without a jury.

So far as here relevant, Rose Williams, the prosecuting witness, testified as follows. She had met the appellant, Henry M. Moxley, for the first time at a bar known as

the Stardust, in Baltimore, on September 5, 1953. She also entered this bar on September 6th about 1 P. M., and again met the appellant who was in the company of a woman named Grace Webb. The appellant left the bar alone and Rose Williams departed about fifteen minutes thereafter. As she stood on the corner near the bar, the appellant drove up in his automobile and asked her to ride with him to look over a painting job that had been offered to him. She sat on the front seat and they drove west on Frederick Road. They finally stopped at a house where he talked to a man about the painting job and was told to come back the next morning and start work. They then proceeded back toward Baltimore. Appellant pulled off the road into a wooded area. He invited her to have a drink which she refused. He made an indecent proposal which she also refused. She started to open the door and he grabbed her around the neck and hit her on the head with a claw hammer. She fell out of the car and he followed and continued to beat her with the hammer. When she attempted to ward off the blows, her arm was broken. She lost consciousness, pleading for mercy. She does not remember where she was found or who found her. On cross-examination she was asked whether she "gave to someone a description of your assailant as being a tall man with dark hair, approximately thirty years of age?" After this question the trial judge stated that he thought the defense should "pin it down to the person and the time and place." The defense attorney stated that he could not do this. An objection was then registered by the State which was overruled by the court in saying "Well, see what she says." Another objection was registered by the State in the following words: "I don't think he ought to fish that way, sir," to which the court replied: "Well, let him fish." The prosecuting witness was then asked: "Did you describe your assailant as being a tall man to anyone, as being a tall man, dark hair, about thirty? Did you make that identification?" to which she answered: "I don't remember if I did or not."

Other testimony shows that after being released from the hospital she took the police to the place where the attack occurred. She was also taken by the police to a parking lot where she identified appellant's automobile, a black 1939 Oldsmobile, from a "whole bunch of cars". She then described various physical characteristics of the car by which she identified it. Certain things were in the car at that time which she had formerly said were also there at the time of the attack, namely: two cushions, an old sweater, a fishing rod, a tool box, and a pair of "paint overalls". She also identified the seat covers of the automobile. She identified the appellant as her assailant when he was brought to the hospital by the police, and also pointed him out in the courtroom. The appellant was a man over sixty-five years of age, of medium build, with gray hair.

John J. Fitzgerald testified that on September 6, 1953, while driving in Howard County, he passed a woman "staggering up the road". He stopped and found that she was bleeding profusely from the head. She mumbled and was very incoherent. When he asked her what happened, she replied: "They worked me over with a hammer." He called the police and she was taken to St. Agnes Hospital.

The hospital records revealed that she was admitted at 5 P.M. on September 6th and the doctor who examined her stated: "The patient was fully conscious on entering the Accident Room, answered questions rather clearly. She stated that approximately one hour prior to admission she was struck on the head repeatedly with a hammer by a man she could not identify." The hospital records also stated that on September 7th "the patient was moving about in bed in a semi-conscious state", and at 8 A.M. "she was aware of surroundings and apparently conscious". On September 11th at 12:15 A.M. "patient attempted to climb out of bed talking irrationally". At 2:30 A.M. "she climbed out of bed and was calling out irrationally". On September 13th at 9 P.M. "restraints were applied to the patient". On September

14th at 2 A.M. "the patient was awake and restless". At 3 A.M. on September 14th "the patient was removed to 'B' Room (an isolation room) because of disturbance caused".

Sergeant Harry M. Harrison, called as a witness by the State, testified in part as follows. He went to the accident room of St. Agnes Hospital on September 6, 1953, about 4:45 P.M. Rose Williams was on the accident table. The doctor was shaving her head. He tried to talk to her because he did not know whether she was going to live or not and he wanted to get any information he could. She would become unconscious and then be about half conscious. He asked her questions and would get a few mumbled words and then she would become unconscious and he would not get any answer at all. He spent probably three quarters of an hour with her, questioning her during that time. She was very hard to understand and he could not get too much information from her at that time.

"Q. Did you at any time that evening, or soon thereafter, secure any kind of a description from her while she was in that condition? A. Yes, sir. I was naturally interested in getting as much description as I could. At that time, she told me she thought the man was tall—

(Mr. Murray) (for the State) He's going to help you, Mr. Manahan. You'll like this. Don't object to it.

(Mr. Manahan) (Attorney for appellant) I don't know whether I will or not.

(Mr. Murray) Go ahead.

A. She said the man was tall and had dark hair, would be in his early thirties, and that he had a white shirt on, and tanned pants. I believe that's about all she said about him.

Q. Tell me, Sergeant, when did she tell you that? A. That was while she was laying on this table in the accident room. Q. While she was still on the table? A. Doctor Thompson was still working on her at that time. Q. Was that pronounced in a clear voice, or was it mumbled in an incoherent way? A. The information

**514**

we obtained over this period of time, three quarters of an hour or an hour. Q. You mean you only got that over three quarters of an hour? A. Yes, sir. I will add that she kept saying that 'Grace knew him'.

(Mr. Manahan) I object to that. I object, and move it be stricken out.

(Mr. Murray) Why do you move that?

(Mr. Manahan) The defendant was not there.

(Court) All right, strike it out.

Q. All right, now, Sergeant—

(Court) Do you want it all stricken out?

(Mr. Manahan) No, sir.

(Court) Then, I'm going to let 'Grace knew him' stay in. You can't throw out part, and keep in part. You've got to play one way or the other. Now, which way do you want to play?

(Mr. Manahan) It's a right hard choice, if your Honor please.

(Court) It's your job to choose.

(Mr. Manahan) I don't want the hearsay in.

(Court) All right, strike it all out then.

(Mr. Murray) All right, sir.

Q. Now Sergeant, did you see her—

(Mr. Manahan) I'd like to have an exception to that ruling.

(Mr. Murray) What's the exception?

(Court) I don't know what it is. But he wants it, so give it to him.

(Mr. Murray) I thought he asked that it be stricken out.

(Court) No, he only asked that a certain part be stricken out.

(Mr. Murray) Oh.

(Court) I struck the whole thing out.

(Mr. Murray) I see.

(Mr. Murray) I make no objection to the Court's actions, understand that.

(Court) I understand."

The appellant objects to the action of the trial judge in

striking out all of this quoted testimony. Neither the State nor the defense objected to any of the testimony of Sergeant Harrison previous to the answer "Grace knew him", as above. The previous testimony was admitted without objection and therefore was properly before the court. It was said in *Martin v. State,* 203 Md. 66, 72, 98 A. 2d 8, a case tried by a trial judge, without a jury: "We think, however, that the appellant waived this right by failing to object to the evidence at the time it was offered. The principle governing the time for objection, which has been stated and restated, is that the one against whom evidence is offered must object as soon as the applicability of the evidence is known or should reasonably have been known to him. *Wigmore on Evidence,* Third Edition, Section 18. In *Dick v. State,* 107 Md. 11, 68 A. 286, 288, the defendant in a criminal case, at the close of the questioning of a witness, objected to testimony. Objection was overruled. The Court held that the evidence 'was given without any objection, and so went to the jury, and the objection as made came too late.' In *Klecka v. State,* 149 Md. 128, 131 A. 29, it was held that an objection to the admissibility of evidence contained in a specific question, must ordinarily be made as soon as the question is stated and before the answer is given or there is a waiver. See also *Diebert v. State,* 150 Md. 687, 693, 133 A. 847; *Courtney v. State,* 187 Md. 1, 4, 5, 48 A. 2d 430; *Asner v. State,* 193 Md. 68, 65 A. 2d 881; *O'Connor v. Estevez,* 182 Md. 541, 35 A. 2d 148; *Rogers v. United States,* 340 U. S. 367, 71 S. Ct. 438, 95 L. Ed. 344." Of course, where the answer is not responsive to the question or, due to the general nature of the question, the answer is disconnected and introduces matter which could not be fairly anticipated, the trial court can strike it out on a timely motion.

The State further contends that where part of a statement is offered, the opponent is afforded the right to introduce or to demand that the proponent produce those parts of the statement which the proponent did not bring

forth. It relies on *Walters v. State,* 156 Md. 240, 243, 144 A. 252; *Gray v. State,* 181 Md. 439, 445, 30 A. 2d 744; *Chisley v. State,* 202 Md. 87, 104, 95 A. 2d 577, and cases there cited. However, here, the proponent was the State and the defense did not demand that the whole statement be produced. The defendant objected only to the introduction of the part where the prosecuting witness said: "Grace knew him."

As above set forth the defense attorney attempted to lay a foundation in order to show that the prosecuting witness had described her assailant as being a tall man, with dark hair, about thirty years of age. Impeaching testimony can be offered when the witness states that she does not remember whether she did or did not make the designated statement. *Wharton's Criminal Evidence,* Section 1359, page 2244; *Woods v. U. S.,* (C.C.A. 4th), 279 F. 706; *Bigham v. State,* 203 Ala. 162, 82 So. 192; *People v. Preston,* 341 Ill. 407, 173 N. E. 383. However, these cases hold that before so impeaching the witness it is necessary to designate the person to whom the statement was given and the time and place it was made. Here, the defense attorney was unable to designate the person to whom the statement was made and the time and place. It was said in the recent case of *Baltimore Transit Co. v. Castranda,* 194 Md. 421, 439, 71 A. 2d 442, 449: "It is an invariable rule that in order to impeach a witness by proof of prior contradictory statements, a foundation for such impeachment must be laid by asking the witness on cross-examination whether he had made contradictory statements to a designated person and informing him of the place where and the time when the statements were supposed to have been made. *Baltimore & Ohio R. Co. v. State, to Use of Welch,* 114 Md. 536, 544, 80 A. 170; *Conrades v. Heller,* 119 Md. 448, 451, 87 A. 28; *Pindell v. Rubenstein,* 139 Md. 567, 574, 115 A. 859. 'This,' Judge Robinson said in *Brown v. State,* 72 Md. 468, 475, 20 A. 186, 188, 'is but fair and just to the witness, in order that he may be enabled to refresh his recollection in regard to such statements, and afforded

the opportunity of making such explanations as he may deem necessary and proper.' If the witness denies that he made the alleged statements, he may then be contradicted by any witness who heard him make them, and the jury will then determine what value to give to his testimony." Therefore, the defense could not itself have shown by cross-examination of Sergeant Harrison at this stage of the case that she did so describe her assailant. Even if the defense had been able to show this, it would have had no weight other than that of impugning the credibility of the prosecuting witness. *Chisley v. State, supra.*

We are therefore of the opinion that the trial judge erred in striking out, over the objection of the defense, the statement voluntarily offered by the State as to the description given by the prosecuting witness of her assailant, as no objection was made at the time it was given.

The State argues in this Court that, even if the exclusion of the description of the assailant by this prosecuting witness given to Sergeant Harrison was error, it is not so prejudicial to the appellant as to justify a new trial. It is true that where evidence is erroneously admitted or excluded, which the record reveals is not prejudicial to the accused, a reversal by the Court of Appeals is not required. *Wolf v. State,* 143 Md. 489, 503, 122 A. 641; *Kiterakis v. State,* 144 Md. 81, 83, 124 A. 401; *Richardson v. State,* 175 Md. 216, 219, 200 A. 362; *Wood v. State,* 192 Md. 643, 652, 65 A. 2d 316; *Martini v. State,* 200 Md. 609, 614, 92 A. 2d 456. In this case, however, the "Grace" mentioned in the hereinbefore quoted testimony, Grace Webb, testified at another stage of the case that Rose Williams on the day in question was "sitting at the bar with a man, a tall, slim like guy, and I was sitting at a table over near the front door. * * * I did go up to the bar to talk to this old lady, and this girl was sitting on a stool right beside me, and there was a man there with his arm around her neck, around her

waist, and he had his arm on her, and me and this old lady was talking, * * *." Grace Webb also testified, when asked the question whether she saw Rose with any company on September 6th: "I saw her with a man at the bar. * * * He was a tall, dark hair fellow. He had on a white shirt. He had the sleeves kinda turned back like that, not all the way down to his cuff, you know, to his wrist. And he had on a kinda bluish gray looking pair of pants: * * *." Also, the old lady referred to by Grace Webb, Margaret Ijams, testified partly as follows: "Q. Did you see anybody with Rose that day? A. She was by herself when she came to the bar, but afterwards she walked across the room to talk to some boy, some big tall six foot guy and two little short fellows. Q. Had anything happened between Rose and either of the tall men, the two little short men that you were talking about? A. No, they were all arguing I guess, because when the music stopped, he got her by the back of the neck, he said, 'Come on gal, let's go', and they started towards the door. I went out one door, and they were going out the other."

The primary question in this case was the identity of the appellant, who was a man over sixty-five years of age, of medium build, with gray hair. The learned trial judge, after striking out the description of the assailant given by the prosecuting witness to Sergeant Harrison, which by no means corresponded to the description of the appellant, naturally did not consider this in reaching his verdict. Why the State offered this is not explained. It might well be that the State thought it only fair to the defense to do so. Of course, the State's attorney could waive the right to keep out this hearsay testimony. But, if he does so, the evidence which comes in has the same probative force as if it were competent. *Martin v. State, supra*, 73. We cannot say that the striking out of this description was not prejudicial error to the appellant. The weight of such evidence was, of course, for the trier of facts. As a new trial is to be awarded

in this case, it is not necessary that we pass upon the sufficiency of the evidence offered here.

*Judgment reversed, with a new trial. Costs to be paid by the County Commissioners of Howard County.*