(No. 15814.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* AMELIO WHITE, Plaintiff in Error.

*Opinion filed February 19, 1924—Rehearing denied April 3, 1924.*

1. CRIMINAL LAW—*the jury must determine weight of contradictory testimony—review.* Where the evidence is contradictory it is for the jury to determine what witnesses are entitled to the greatest credit, and a reviewing court will not disturb a verdict finding the defendant guilty unless it is satisfied, from a consideration of all the testimony, that there is a reasonable doubt of guilt.

2. SAME—*when defendant's flight casts suspicion on his testimony.* The defendant's immediate flight from the scene of the crime and from the country is a circumstance tending to cast suspicion on his testimony if it conflicts with that of other witnesses.

3. SAME—*when jury may be instructed as to verdict for lesser offense.* An instruction may properly be given that the accused may be found guilty of a lesser offense embraced in the crime charged if there is evidence on which to base the instruction, even though there is also evidence that the crime charged was committed.

4. SAME—*one charged with murder may be found guilty of manslaughter.* The crime of manslaughter is embraced in a charge of murder, and the accused may be found not guilty of murder and convicted of manslaughter if the evidence authorizes it.

5. SAME—*when instruction as to manslaughter may be given in murder trial.* An instruction as to manslaughter is proper in a murder trial where the evidence shows that the homicide was committed by a shot fired during a fight or quarrel which suddenly arose and in which the defendant and two other parties were participants, as under such circumstances it is not conclusive that the crime was murder and nothing else.

6. SAME—*when jury may be instructed to consider flight of the defendant.* In a murder trial the jury may be instructed that the fact that the defendant immediately after the homicide fled to Canada and remained there until he was taken into custody is proper to be considered in determining his guilt or innocence, the fact of such flight being undisputed.

WRIT OF ERROR to the Circuit Court of Christian county; the Hon. THOMAS M. JETT, Judge, presiding.

HOGAN & REESE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, EDWARD E. DOWELL, State's Attorney, and GEORGE C. DIXON, (HARRY B. HERSHEY, of counsel,) for the People.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

This writ of error is prosecuted to review a judgment of conviction in the circuit court of Christian county of Amelio White, alias Amelio Bianchi, for the crime of manslaughter.

Defendant was indicted for the murder of William Motley on January 14, 1923. Motley was mayor of the village of Kincaid, and the homicide was committed in that village on a Saturday night, shortly after midnight, in the basement of a building where a dance had been going on on the floor above the basement. The building is a concrete block building facing north, and is seventy or eighty feet long north and south by about thirty feet wide east and west. Under the south end of the building there is a basement about sixteen feet in width north and south. Sandwiches and liquor were sold in the basement while the dance was in progress, and it was visited by large numbers of the men attending the dance. There is a stairway leading from the inside of the south part of the building to the basement and an outside stairway leading from the rear of the building to the basement, at the bottom of which stairway is a wooden door opening into the basement. South of the building is an east and west alley, leading on the east to a street running north and south and on the west to the railroad station. Defendant is an Italian, and he and an Italian friend, Tony Dortanver, went to the dance together. They were in the basement when Motley and Harry Vancil, the village marshal, went down there a few minutes after midnight. Motley, who, as we have said, was mayor of the village, ordered the men to get out of the basement,

as it was Sunday. Tony engaged in a controversy with him, and, as the witnesses say, rushed Motley, scuffled with him, grabbed him around the waist and pinned his arms down by his side. Either from a blow or a push Motley staggered forward, and just as he did so he was shot in the forehead with a pistol, from which wound he died shortly afterwards. The shot that killed Motley was followed by fifteen or twenty other shots, and Tony was found lying dead on the floor with a bullet hole near the top of his head, the bullet ranging downward and lodging in his teeth. Defendant denies he shot Motley, denies he had any gun, and very earnestly contends that the proof was not sufficient to sustain the conviction for manslaughter. He disappeared immediately after the shooting and was located about three weeks later in Montreal, Canada, where he was arrested and returned for trial.

Vancil, the police officer, testified he and Motley went down into the basement together, Motley in front. Defendant and Tony were in the basement and Tony started an argument with Motley, who asked him to be a good fellow and make no trouble. Motley walked over to the north-east corner of the basement and Tony followed him. Using his language as abstracted: "Tony scuffled; he rushed in at Motley, and as he rushed in Amelio White [defendant] rushed in too; looked as though he pushed him, and he started to fall forward, and as he fell there was a shot fired; he fell straight out; his arms flew back; I seen the flash of the gun in between Amelio White, Tony Dortanver and William Motley; immediately after he fell the two men turned and started firing at me; I mean the two men Tony and White; both had guns." Witness testified he started backing up the stairway and firing; that when he got to the top of the stairway he went to the southeast corner of the building. Percy Manuel and defendant came out. Defendant looked over to Mike Burk and said, "You son of a bitch, if you tell what you seen in that basement

you will be next," and turned to Manuel and said, "You too." Witness called to the defendant to stop, and he opened fire on the witness. He fired at him twice. That was in the back yard. Witness fired at defendant three times as defendant disappeared. Witness testified he afterwards examined the basement for the marks of bullets. Over the top of the basement door, where he came out, there were two bullet holes in the cement wall and two in the top right over where he had been standing. The evidence shows that there were, all told, some fifteen or more bullet holes in the basement near where the witness, Motley, Tony and defendant were. Neither this witness nor any other witness testified positively that defendant fired the shot which killed Motley, but a number of witnesses testified the flash of the pistol came from between defendant and Tony and Motley, and that they were very close to him, one on his right and one on his left.

Sam Mottershaw testified he was in the basement when Motley and Vancil came down and asked the crowd to leave. The witness left, went up-stairs and did not see the shooting but heard several shots fired. He saw Vancil back out of the basement up the stairway but did not see him shooting. Vancil went to the southeast corner of the building and was about two and one-half feet from where witness was standing. Witness saw Percy Manuel come out and then defendant came out. Defendant tapped Manuel on the shoulder and told him to keep still and went south toward the alley. Defendant and Vancil fired some three or four or five shots at each other as the defendant was leaving. When defendant came out of the basement he had a gun in his hand.

Andrew Keirs, Jr., a boy sixteen years old, testified he was in the basement when Tony rushed Motley and pushed him to the northeast corner. Defendant was near by. Witness heard the shot and saw Motley fall. He testified he saw the flash of two guns. One looked like it came from

where Tony was when he whirled around from Motley; the other was close to where defendant was standing. Witness went up the stairs and did not see defendant after that. He saw Vancil at the southeast corner of the building and saw him fire at somebody, and the person he fired at fired back at Vancil twice. He could not tell who it was. Witness testified Tony fired toward Vancil after the first shot.

Harry McKenna testified, as several other witnesses did, about Tony scuffling with Motley after he was ordered to get out of the basement and the firing of a shot. He heard several other shots in succession, but by that time he was out of the basement.

A gun which had not been fired was found lying by the body of Motley, and a gun and brass knucks were found by the body of Tony and a razor was sticking out of his pocket.

Dominic Gianasa, a boy thirteen years old, living in Kincaid, testified that the morning after the homicide he went to the mine where his father worked and on the way found a revolver. The place where he found it was east of the depot, toward Jeisyville, where the defendant lived. The gun was produced and identified but was not offered in evidence.

Pete Maschio and wife testified defendant came to their house, where he roomed, between one and two o'clock in the morning, changed his clothes and left and did not return.

The witnesses are substantially agreed that defendant went to the dance in his shirt sleeves; that he wore no belt, and no one saw a gun on him before the shooting began.

Defendant testified in his own behalf that he was twenty-six years old. He came to Kincaid in August, 1919, and had been working in the mines. He roomed and boarded at Maschio's, in Jeisyville. He testified he wore no coat or hat when he was in the basement. He had no gun or weapon and did not own one. He saw Tony and Motley quarreling and could not understand why they got so angry.

Motley had a gun in his hand and ordered everyone to get out. Pretty soon he heard shots and saw Motley and Tony, with guns, facing each other. Then there were more shots and he saw Motley fall, and witness exclaimed to Tony, "You killed Motley!" Pretty soon he heard voices from his side say, "Whitey, get out; if you don't you going to get mobbed." He left the basement and went over the wagon road to Jeisyville. After he got out he heard shots fall. Didn't know how many. When he got to Jeisyville he went to his boarding house and changed clothes. He was running and didn't stop to tell anyone to keep still or he would kill him. He didn't see Manuel on his way out. After arriving at his room and changing his clothes he went west through Bulpitt and through corn fields until he got past the village of Tovey. A taxi came along and he got in it and went to Peoria. From there he went to Detroit and then to Montreal. He denied shooting Motley and denied having had a gun in his hand. He testified there was no place about his clothes where he could have concealed a gun.

Pete Bellegante testified he was in the basement when the shooting occurred. He saw Motley and Tony looking at each other and they didn't look very good. Tony had his hand under his coat. Vancil was standing at the first step of the stairway and had his hands in his coat pocket. Defendant was six or eight feet from Motley and took no part in the conversation between him and Tony. Witness asked Tony to go home and tried to get him out. Witness stopped at the top of the stairs to talk to Mottershaw and heard Motley order everyone out of the place. Just following that he heard one or two shots. He thinks he heard thirty-five or forty all told.

Several witnesses testified for defendant that his reputation as a peaceable and law-abiding citizen was good.

It is earnestly insisted by defendant that he was unarmed and could not have shot Motley. In addition to his

own testimony that he had no gun he insists that it was impossible for him, dressed as he was, to have concealed a gun on his person so that it would not have been seen before the shooting took place, and no witness testified to seeing a gun on his person before that time. On the other hand, Vancil testified defendant had a gun and fired at him as he was backing out of the basement; that defendant came out of the basement with a gun in his hand and started south toward the alley running east and west south of the building; that he (Vancil) shot at him two or three times as he was going and that defendant shot at the witness twice as he was disappearing in the darkness. Mottershaw testified he saw defendant come up out of the basement and that he had a gun in his hand, and after tapping Manuel on the shoulder and telling him to keep still defendant went south toward the alley and three, four or five shots were exchanged between him and Vancil. There was some other testimony that the man who went south from the building did some shooting. It was a material issue whether defendant had a gun, and on that question there was conflicting testimony. It was a matter for consideration of and determination by the jury. When the evidence is contradictory it is for the jury to determine what witnesses are entitled to the greatest weight and credit. This has been so often decided by this and other courts, and the rule is so familiar, as to make the citation of authorities unnecessary. It is only when a reviewing court is satisfied, from a consideration of all the testimony, that there is a reasonable doubt of the defendant's guilt that the verdict and judgment will be disturbed. The jury must have believed the testimony for the People that defendant was armed with a gun. There is nothing inherently improbable or unreasonable in their adopting that belief. The jury had the advantage of seeing the witnesses and hearing them testify, which has always been recognized as giving better opportunity to determine the weight which the testimony

should receive than a reviewing court has by reading it from the abstract. Also, defendant's immediate flight from the building and from the country was a circumstance tending to cast suspicion on his testimony. Considering all the facts and circumstances proved, a reviewing court would not be warranted in reversing the judgment on the ground that it was not warranted by the evidence.

Complaint is made of the admission of the testimony of Gianasa, the boy who found a revolver the morning after the homicide, between Kincaid and Jeisyville. Defendant testified that the route he took from Kincaid to Jeisyville was not near the place where the gun was found. It was found on a route which was one way to Jeisyville and a route which defendant could have taken on his way to Jeisyville. There was no proof, however, that he did take that route. That defendant had a gun when he started for Jeisyville is testified to by other witnesses, and the proof of finding the gun, whether it was defendant's or not, was not of such a damaging character, even if improperly admitted, as to require a reversal.

Defendant contends it was error for the court to instruct the jury on the subject of manslaughter and that under an indictment for murder the accused might be convicted for manslaughter. The argument in support of that assignment of error is that there was no evidence to base the instruction on; that if defendant was guilty of any crime it was murder. Reliance is placed on decisions that if the evidence admits of but one conclusion,—that is, that the defendant, if guilty at all, is guilty of the crime charged,—it is erroneous to instruct the jury he may be found guilty of a lesser offense. (*People* v. *Moore,* 276 Ill. 392; *People* v. *Schultz,* 267 id. 147.) In the case of *People* v. *Moore* the court said an instruction may properly be given that the accused may be found guilty of a lesser offense embraced in the crime charged if there is evidence on which to base the instruction even though there was also evidence that the crime charged

was committed. The crime of manslaughter is embraced in a charge of murder, and the accused may be found not guilty of murder and convicted of manslaughter. It is undoubtedly true that when the charge is murder and the evidence conclusively shows the crime committed was murder it would not be proper to instruct that the accused might be found guilty of a lesser offense, but where the homicide was committed during a fight or quarrel suddenly arising it is not always conclusive that the crime was murder or nothing. Under the circumstances the proof shows attended the killing of Motley, we think it was not improper for the court to instruct as it did on the subject of manslaughter.

Complaint is made of the giving of several other instructions for the People. It is said some are argumentative and not based on evidence; in some are repetitions; one singles out and gives prominence to defendant's flight; one is an abstract proposition of law and assumes the use of a weapon by defendant. It is true, part of a rule of law stated in one instruction is in substance embraced in part of another, but none of them are entire repetitions. The court might have been justified in modifying the instructions by striking out the repetitions, but giving them as they were given does not constitute reversible error, as it clearly seems defendant could not have been prejudiced by the instructions. The court instructed the jury that if they believed from the evidence defendant immediately after the homicide fled to Canada and remained there until he was taken into custody, such flight was a proper circumstance to be considered in determining the guilt or innocence of defendant. We are unable to see any objection to this instruction. *Siebert* v. *People,* 143 Ill. 571.

We are of opinion defendant was not prejudiced by erroneous instructions given for the People.

Our conclusion is that the case made against defendant, as shown by the record, is not one in which a review-

ing court would be warranted in interfering with the verdict of the jury and the judgment of the trial court.

The judgment is affirmed.     .     *Judgment affirmed.*