THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY HATFIELD, Defendant-Appellant.

(No. 11471;

Fourth District—June 19, 1972.

*Rehearing denied July 20, 1972.*

John F. McNichols, of Defender Project, of Springfield, (Bruce L. Herr, of counsel,) for appellant.

Richard A. Hollis, State's Attorney, of Springfield, (Bruce Locher, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE SIMKINS delivered the opinion of the court:

Defendant-Appellant Larry Hatfield, Stuart Wiant, and John L. Powell were jointly indicted for the offense of Rape allegedly committed December 29, 1969. The victim was Eileen Shaheen, who was 17 years of age. Count II of the indictment charged the same three individuals with burglary of the residence of John H. McCutcheon, Rural Route 5, Springfield, Illinois, on December 29, 1969.

Counts III and IV charged the defendants with contributing to the sexual delinquency of a child and with theft. Counts III and IV were subsequently dismissed by the Court.

On May 12, 1970, Defendant Wiant entered a plea of guilty to Counts I and II, and was sentenced to an indeterminate term of 4 to 10 years on each count, the sentences to run concurrently.

Commencing June 8, 1970, the Defendant Hatfield was tried for rape and burglary before a jury, which returned a verdict finding him guilty of attempted rape and burglary. Defendant was sentenced 4½ to 14 years for the attempted rape and 4½ to 14 years for burglary, the sentences to run concurrently. This was defendant's first felony conviction. His record discloses a previous conviction in 1969 of criminal damage and trespass of property for which he had been given probation. He was 18 years of age at the time of the offense here in question.

On the morning of December 29, 1969, Powell and Wiant went to the home of Defendant Hatfield. They drove there in Powell's 1958 Thunderbird. The three men left defendant's home in a 1958 Ford station wagon with blacked-in windows, Powell drove. They proceeded north on Walnut Street Road, intending to commit one or more burglaries. As they approached the residence of John McCutcheon they observed Mr. and Mrs. McCutcheon leave the premises in their automobile at approximately 10 A.M. Shortly after the McCutcheons' left, the three drove into the driveway of the McCutcheon home, Wiant went to the front door, knocked and rang the doorbell for some time in an effort to ascertain whether or not anyone remained in the house. There being no response he returned to the station wagon which Powell then drove to the rear of the house where the defendant and Wiant got out, intending to enter and commit the burglary. Powell then left the premises in the station wagon. There were several inches of snow on the ground, and he became momentarily stuck in the snow and finally backed out to the high-

way. He intended to return later, pick up the defendant and Wiant, and the property taken from the home.

Eileen Shaheen, who was 17 years of age at the time, resided in the residence with her grandparents, Mr. and Mrs. McCutcheon as did her mother. Her mother worked, had left earlier, and Eileen was alone in the house. It was Christmas vacation, she was awake but still in bed and dressed in her pajamas. She heard the insistent knocking on the front door, and the ringing of the doorbell and soon went to the window. She saw a man with black hair run up the steps, she subsequently identified this person as Wiant. She saw the tan station wagon with the blacked-in windows. It was momentarily stuck in the snow, the driver's window was down. She observed the driver; her description of the driver given to the police was that of a man with blonde hair and whiskers, and subsequently identified the driver as Powell.

Eileen became frightened when she saw Wiant on the back steps, ran into her mother's bedroom and hid in the closet where she remained standing. She closed the sliding doors to the closet. She then heard the back door broken in. Someone then ran up the steps and pulled the telephone from the wall. A person then came into the room where she was hiding and begin to rummage through the dresser drawers. This individual then opened the closet door, discovered Eileen's presence, looked at her for "a couple of seconds", then placed his hands in front of her face. She subsequently identified this man as the defendant Hatfield. Hatfield then yelled to Wiant who came into the room, though she was prevented from seeing him by reason of defendant's hand over her face. He did speak from time to time. They then covered her head with a dress. The two men then dragged Eileen from the closet, Wiant got on top of her, held her hands, struck her in the face with his fist, finally told defendant to hold her legs and spread them apart, which he did, and Wiant then raped Eileen. The defendant then got on top of her, both men held her arms, but no one held her legs, and defendant did not make penetration. There is absolutely no question but that rape occurred; there is no point in detailing at length physical findings testified to by Doctor William Bernard who examined the victim shortly after the incident; he testified to the presence of sperm, the tearing of the hymen and to the other uncontradicted physical and conclusive evidence of forcible intercourse which had, in his opinion, occurred.

Following the attack defendant and Wiant put the bedspread over her head, tied her hands behind her back and again placed her in the closet; she was told that if she told anyone what had happened she would be killed. A few minutes later the defendant returned, and talked to Eileen for about five minutes. He asked her name, how old she was, told

her to straighten up the room after they left, told her that Wiant was apprehensive that she might be able to identify the defendant, told her they wanted to take her grandfather's car. She did not hear the men leave the house. She was able to differentiate the two men, after her head and eyes were covered, by the difference in their voices. She had seen defendant when he opened the closet door, and he had yelled at Wiant to announce his discovery while holding his hand over her face. She was able to distinguish a real deep voice from a soft spoken one. Thus she identified Wiant as the first man on top of her from the second, unsuccessful attempt made by defendant. She also identified, by voice recognition, that it was defendant who returned to the closet and talked to her for five minutes.

Mr. and Mrs. McCutcheon returned home about 10:30 A.M.; found Eileen in a state of hysteria, her face bruised; she told them of the attack, her mother was called and she was taken to the hospital where Doctor Bernard examined her and directed that she remain in the hospital overnight. He administered the drug visterene which, he said, calms a patient so that she can think straight and makes a person more alert so that accurate information can be elicited.

While Powell was driving around the neighborhood in defendant's station wagon he drove both north and south past the McCutcheon residence, apparently awaiting some signal from his confederates to return to the house. He made several turn arounds in the driveway of a small country grocery store operated by Elam Phillips. Phillips observed that the driver had light blonde hair and a goatee which confirmed Eileen's description.

The area around the McCutcheon home is a rural area, and neighbors observe things. Two neighbors had seen the station wagon with the blacked-in windows and had seen two men leave the station wagon and run to the rear of the house and had seen the vehicle become momentarily stuck in the snow, in the process of leaving the premises. Still another neighbor noticed something. Donald Patrick and his son Mark, operate a heating and air conditioning business, and their shop and home is in the general vicinity of the McCutcheon home. As they were getting ready to leave in their truck they observed the tan station wagon with the blacked-in windows cruising slowly in the neighborhood, did not recognize the car and their suspicions became aroused so they began to follow it. Powell observed this became alarmed and driving at speeds up to 80 miles per hour took off for Springfield with the truck behind him and gaining. Finally, at the intersection of Walnut and North Grand streets in Springfield they got close enough to secure the license number of the station wagon and promptly called the Crime Stop number, re-

lated their suspicions and gave the police the license number of defendant's station wagon.

Powell proceeded to defendant's home, left the station wagon there and drove his own car, the 1958 Thunderbird out past the McCutcheon house, honked the horn, proceeded down the road to the store operated by Mr. Phillips and went in and purchased a bag of potato chips. Phillips noticed that this was the same man whom he had previously observed in the station wagon and wrote down the license number of Powell's Thunderbird and subsequently gave that number of Officer Gribble.

Powell then returned to the McCutcheon residence where defendant and Wiant ran out and got in the car and the three then returned to the City. Powell testified to these matters on behalf of the People. He had previously plead guilty to burglary of the McCutcheon residence and had been given probation and it is a fair inference that the plea, and the granting of probation had been negotiated in exchange for his willingness to testify. However, Powell's testimony is supported by numerous independent witnesses as above indicated. Wiant was not called as a witness. The police secured descriptions of the three men from Miss Shaheen. She described Powell the driver of the station wagon as being light blonde and with whiskers. This matches the description of the other witnesses. It also matches his appearance in the photo of him introduced during the hearing to suppress identification except that he is clean shaven. He admitted to wearing a goatee on December 29th. She described the man who ran up the back steps as having black hair. The photo of Wiant, while not in color, shows very dark or black hair. She described defendant as having dark blonde hair, wearing square black glasses and about six feet tall. The photo of defendant taken in front of a background scaled into feet and inches, matches this description.

The police had the defendant in custody sometime prior to 1:30 P.M., on December 29th. He was interviewed briefly by Deputy Truman Burge and a Mr. Francis an Assistant State's Attorney. Francis was in military service at the time of the trial and unavailable as a witness. Defendant's rights under *Miranda v. Arizona,* 384 U.S. 436, were explained to him and he signed a written acknowledgment of that fact. He was also asked if he would consent to be taken to the hospital room of Miss Shaheen to be viewed by her, he consented and in writing stated his consent to that procedure and expressly waived the presence of counsel. There is no contention that this consent was not voluntarily and intelligently given.

After securing the defendant's consent he was taken to the hospital room of Eileen Shaheen at about 1:30 P.M., on the 29th, by Deputy Burge, Assistant State's Attorney Francis went along. Officer Burge could

not recall whether other deputies were present. The defendant was asked to speak a few words, but words Burge could not recall. Burge testified that at the hospital, Miss Shaheen did not positively identify the defendant, saying that she was not sure.

Miss Shaheen's testimony differed from that of Deputy Burge. She testified that there was another deputy present, that the words which defendant was requested to, and did speak, in her presence were "get in the corner". That she positively identified defendant at the hospital and that she did so because she had seen him at the house and that she was positive of the voice.

Miss Shaheen was released from the hospital on the following day, December 30th and on that day Deputies Burge and Gribble took eleven photos to the McCutcheon home for Eileen to see. Among the photos were one each of defendant, Wiant and Powell. Three of the photos, in addition to that of defendant, showed individuals wearing glasses. The deputies placed the eleven photos on the table and Miss Shaheen selected and identified those of defendant, Wiant and Powell. She testified that she was nervous and scared at the hospital, that the *primary* basis for her identification in the hospital was defendant's voice. That *before* defendant was brought into the room she described him and that she knew what he looked like *"but I was positive of the voice"*, and that her identification at the hospital was also because she had seen him at the house. That her identification in court was based on seeing him at the hospital and "because that's the man I saw open the closet door". The court denied defendant's motion to suppress the identification.

The bedspread, examined at the State Crime Laboratory, revealed the presence of sperm and on a pair of defendant's shorts, taken from his home under authority of a search warrant, were indication of human seminal fluid.

Defendant first contends that the court erred in permitting the jury to return a verdict of guilty of attempted rape, because there was no evidence to support such a verdict. His argument is that since there is no question but that a rape occurred and since the court instructed the jury "\* \* \* that they *must* find the defendant guilty if they found that he aided and abetted in the planning or commission of either crime and also instructed the jury on the issues of attempted rape, and that since the sole issue was the identity of defendant he was either guilty of rape or not guilty of rape, that the jury should have not been instructed on attempt and if it had not been for that instruction "\* \* \* he would have been entirely acquitted on the rape charge". (Emphasis supplied.)

This is a tenuous argument and it's rationale obscure. First: There is indeed evidence of attempted rape in the testimony of the victim, and

there is no need to repeat that testimony. She identified defendant as the second man who got on top of her and testified that he did not achieve penetration.

Second: The Court did *not* instruct the jury that it "must find the defendant guilty if they found that he aided and abetted in the * * * commission of either crime * * *." If the Court *had* so instructed the jury no doubt the defendant would now stand convicted of rape, and with abundant evidentiary support for the verdict. The Court gave IPI Criminal 5.03. That instruction does not tell the jury that it *must* do anything. It simply states that a person is responsible for the conduct of another when he aids and abets another in the commission of a crime. *Sanding alone*, the instruction does not inform the jury what that responsibility is, it does not tell the jury that the person aiding and abetting may be convicted of the crime committed by the one he aided and abetted. This instruction was accompanied by IPI Criminal 9.03 which told the jury that "To sustain the charge of rape, the State must prove * * * That the defendant had sexual intercourse with Eileen Shaheen" and that if the State *failed* to prove that then they should find the defendant not guilty. The Court also gave IPI Criminal 6.07 which set forth the issues in attempt.

■■ To state what the jury made of instruction 5.03, being laymen, would be to indulge in sheer speculation. Lawyers would have no difficulty with its meaning, nor with its *application* to this case. But here, after giving the jury that instruction, it was then told, in instruction 9.03, that it could *not* convict of rape unless it found that the defendant had had sexual intercourse with the victim, and she had testified to the contrary. They proceeded to follow both the evidence and instruction 6.07 and returned a verdict of guilty on the attempt, and the verdict is amply supported by the evidence.

■■ IPI Criminal contains no issue instruction which embodies the legal concept set forth in 5.03. We suggest that this proposition should not be submitted to a jury unless an accompanying issues instruction is also given. The jury should be instructed on how to deal with the legal principles set forth in 5.03. As to the attempt instruction defendant did not object to its submission to the jury.

The question relative to the problem posed by the giving of the attempt instruction most often arises in conjunction with cases involving the principal charge of murder and the propriety of giving an instruction on manslaughter. (See *People v. Brown*, 415 Ill. 23, 112 N.E.2d 122.) It was held in *People v. Beil*, 322 Ill. 434, 440, 153 N.E. 639 that "Where the record contains evidence upon which a verdict of manslaughter may be returned, the fact that the evidence would have justified the jury in find-

ing the defendant guilty of murder is not a matter of which he can complain." (See also *People v. White*, 311 Ill. 356, 143 N.E. 108; *People v. Taylor*, 36 Ill.2d 483, 489, 224 N.E.2d 266.) No case has been cited which involves the application of the rule in the precise context present here. It has been held that instructions in a prosecution for rape which permit the jury to find the defendant guilty of an assault with intent to commit rape should not be given where the evidence that the act of sexual intercourse was complete so that the jury, if it believed that the act was forcible could have returned no other verdict than that of guilty of the rape. The court remarked that to so instruct the jury amounted to an invitation to return a compromise verdict. (*People v. Lewis*, 252 Ill. 281, 96 N.E. 1005.) In *People v. Shelton*, 388 Ill. 56, 57 N.E.2d 473, the defendant urged error in the giving of an instruction defining assault with intent to commit rape, contending that he was guilty of rape if anything.

The Court distinguished *Lewis, supra*, by saying that in *Lewis* the evidence, if believed, was conclusive that intercourse had occurred and the jury could have returned no verdict other than guilty if it believed the act was forcible, but that there was conflicting evidence in *Shelton* which, if believed, would prove defendant guilty of no more than assault with attempt to commit rape. Defendant cites the following language from Jury Instructions on Lesser Included Offenses, 57 N.W.L. Rev. 62, 71 (1962).

"* * * the virtually universal position on this question is that an instruction is error when there is no independent evidence to justify conviction of the lesser offense and the defendant is so convicted. The reason, obviously, is that, but for the erroneous instruction, the defendant might have been acquitted."

Here there is, as mentioned above, independent evidence contained in the testimony of Eileen Shaheen and the physical evidence and expert testimony concerning defendant's clothing, to support the attempt conviction. Basically, defendant is arguing that *despite* the independent evidence of attempt, the fact that defendant should have been found guilty of rape because he aided and abetted Wiant who did complete the act, his conviction should now be overturned. We disagree. First, there is the independent evidence to support the verdict. There is absolutely nothing to indicate that the verdict was compromised, rather it reveals the jury's compliance with instruction IPI 6.07.

Had the jury been instructed how to deal with instruction IPI Criminal 5.03, it is inconceivable that it would not have returned a verdict of guilty of rape. But the fact that the evidence would warrant such a verdict under the legal theory contained in 5.03, does not vitiate defendant's conviction of attempt since it has an independent factual

basis. The better practice here would have been to incorporate 5.03 into an issues instruction. There was no error in this case in the giving of the attempt instruction and the verdict finding defendant guilty of attempted rape is supported by the evidence.

■■ Defendant also complains of the pretrial identification of the defendant at the hospital, claiming it to be, in the language of *Stovall v. Denno,* 388 U.S. 293, "* * * so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law", and he also cites other authority condemning single suspect show-ups. The "suggestive" problem in the single suspect confrontation is the appearance of the suspect in custody of the police which implies that they believe him to be the person involved in the crime under investigation. Here, however, defendant expressly and voluntarily consented to the precise procedure followed, and there is no evidence or contention that the consent was not voluntary and intelligent. On the hearing on the motion to suppress defendant did not testify. He cannot now urge as error, the utilization of the procedure to which he agreed simply because it turned out badly.

The identification by Eileen of defendant, Powell and Wiant from the eleven photos was not accompanied by any suggestions from the police who simply placed the photos on the table. There is no evidence that the photos of these three were arranged in any pattern which would be suggestive, they appear to have been mixed in with eight other photos and when Eileen, from the brief glance of Wiant running up the rear steps, identified him from the photograph it speaks something for her powers of observation.

In addition the in court identifications of defendant had a source independent of the photos and the hospital confrontation. The victim saw defendant and heard him speak. True, her view at the house was for a brief period, but her description given to the police was accurate and there was no error in overruling defendant's motion to suppress the identification, *e.g., People v. Blumenshine,* 42 Ill.2d 508, 250 N.E.2d 152.

■■ Even absent defendant's consent to being viewed singly, we are of the opinion that the procedure was proper, under the facts in this case, by reason of the rule enunciated in *People v. McMath,* 45 Ill.2d 33, 256 N.E.2d 835. (See also *People v. Bey,* 42 Ill.2d 139, 246 N.E.2d 287.) Nor is the challenged identification here the only proof of guilt. Powell clearly places Defendant and Wiant in the McCutcheon residence, defendant's clothing bore evidence of seminal stain, neighbors saw two men entering the home at the time in question. That defendant was present and com-

mitted the crimes is established beyond any doubt. Denial of the motion to suppress the identification was not error.

The defendant also contends that his sentence is excessive especially in view of the fact that Wiant was sentenced, after a plea of guilty to rape and burglary, to 4 to 10 years. The trial judge stated that defendant's degree of participation was approximately the same as the participation of Wiant, and we agree with that observation. We are, however, unable to ascertain from the record any basis which would warrant the disparity in the sentences imposed upon Wiant and the defendant. As the trial judge observed at the time of imposing sentences their conduct was essentially the same and this was defendant's first felony conviction. The court did make the following statement: "The Court is aware of the need for some consistency in sentencing, so the Court would start with the basis that Mr. Hatfield's degree of participation is no less than what Mr. Wiant's degree of participation was, so we start with the premise that the defendant should be sentenced to not less than four nor more than ten years.

Now, it's a question whether anything should be added onto the four or added onto the ten. * * * To me, there is only one reason why that station wagon was blacked out. That was what I would consider a burglary wagon, and I'm not even going to try to speculate as to what any prior use of that station wagon is, because there is nothing in the record that would allow the Court to draw any inferences on that effect."

"Disparity of sentencing is a serious judicial problem. It can arise when defendants of like background and like prospects for rehabilitation are given unlike and disparate sentences. It can also arise where defendants of substantially different rehabilitation prospects and different backgrounds and different records are given the same sentence." *People v. Lobb,* 1 Ill.App.3d 239, 243, 373 N.E.2d 206.

■■ Since no factual basis appears in the record to explain or support the sentence disparity, and since the conduct of Wiant and defendant was almost identical; it is ordered that defendant's maximum sentence for burglary is reduced from 14 years to 10 years, and defendant's maximum sentence for the attempted rape is reduced from 14 years to 10 years, the sentences to run concurrently. The minimum sentences imposed by the trial judge are affirmed. Defendant's convictions are affirmed. The Clerk of the Circuit Court of Sangamon County is directed to issue an amended *mittimus* to reflect the reduction in the maximum sentence.

Judgment affirmed; sentence modified.

CRAVEN, P. J., and SMITH, J., concur.