THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LAWEEDA WILLIAMS, Defendant-Appellant.

First District (2nd Division)    No. 80-207

Opinion filed June 16, 1981.

Ralph Ruebner and Bradley S. Bridge, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes and Barry S. Pechter, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, LaWeeda Williams, and her co-defendant, Michael Johnson, were charged by indictment with two counts of attempt murder, one count of armed robbery, two counts of unlawful restraint, one count of unlawful use of weapons and two counts of armed violence. Following a jury trial, defendant Williams was found guilty of armed robbery and was sentenced to serve nine years in the Illinois Department of Corrections. From that judgment Williams appeals, presenting the following issues for review: (1) whether the trial court's failure to give the jury the second paragraph of the Illinois Pattern Jury Instructions (hereinafter IPI) on the presumption of innocence and reasonable doubt (IPI Criminal No. 2.03) requires reversal of defendant's conviction; (2) whether the jury should have been instructed on the affirmative defense of compulsion; (3) whether defendant was prevented from testifying as to her state of mind during the armed robbery; (4) whether the trial court should have

included in the armed robbery issues instruction the requirements of accountability; and (5) whether error was committed in defendant's sentencing. For the reasons hereinafter set forth, we affirm the judgment of conviction and the sentence imposed thereon.

Shortly before midnight on September 12, 1978, the Burger King restaurant at 12701 Ashland Avenue in Calumet Park was robbed. Immediately prior to the robbery there were seven persons present in the restaurant—Gail Harmsa, who was there to visit her friend Bob Crnogorace, a night manager who was not working that evening, and five employees, Carlotta Bernal, Donald Nelson, Marianne Gerritson, Gertrude Early and Ray Hernandez. Harmsa and all of the employees on duty except Hernandez testified for the State.

Carlotta Bernal, the cashier, was standing by the order counter when Michael Johnson, Williams' co-defendant, approached her and ordered a fish sandwich. Bernal placed the order and stepped over to the sandwich counter to see if Marianne Gerritson had finished preparing it. As Bernal turned around, Johnson displayed a sawed-off shotgun, pulled a scarf over his face, jumped over the front counter and walked to the back of the restaurant. A tall black male, later identified as Lonnie Arsbury (Asenbury), came up behind Gail Harmsa and ordered her not to turn around. Arsbury, who was armed with a semiautomatic pistol, instructed Bernal, Harmsa and Ray Hernandez to proceed to the office area in the back of the restaurant. Arsbury also told Donald Nelson and Marianne Gerritson, the two employees at the sandwich making counter, to go to the back office. There they joined Gertrude Early, the night manager on duty, and Harmsa's friend Bob Crnogorace, who were being held at gunpoint by Johnson.

Defendant Williams entered the office area after Arsbury, Harmsa and Hernandez. Arsbury and Johnson ordered everyone to lay down on the floor. Defendant Williams did not get on the floor and none of the State's witnesses saw either Arsbury or Johnson point a gun at her. Williams did not menace or threaten any of the employees or give them any orders. Although no one inside the restaurant ever saw Williams with a weapon, one of the police officers who arrived at the scene a few minutes after the robbery commenced, J. Kraft, testified that as he peered through the front doors of the Burger King he observed Williams holding a small caliber handgun which was later recovered by the police.

In the back office defendant Johnson moved next to the safe and ordered Early, the manager, to open it. Before she could comply, a customer came into the restaurant which had not yet closed. Defendant Williams said, "there is somebody out there who wants food," or words to that effect. Arsbury told Williams to watch the employees. Williams moved her hands in her pockets and nodded affirmatively. Arsbury then

ordered Early to lock the doors and get rid of the customer. He followed her out into the front of the restaurant, picked up a broom and pretended to be sweeping while Early told the customer, "I'm closing. I'm out of everything, please leave. I'm going to lock the doors." Arsbury then instructed Early to turn off the lights in the restaurant. Early had to go through the office area to do so. As Early started turning off the lights, Williams asked her what she was doing. Early responded that she was doing what she had been told to do. Neither Johnson nor Arsbury was present with defendant Williams and Early at that moment.

After Arsbury returned to the office area, he ordered Early to open the safe. While she was doing this, the telephone rang. Johnson told Early to answer it. She picked up the receiver, answered a few questions, then hung up the telephone. At Arsbury's direction, Johnson took Early's purse, emptied its contents and started stuffing it with the money from the safe. Arsbury helped Johnson fill the purse with all the paper money and rolled change from the safe. Arsbury and Johnson asked the employees if there was any more money. Early informed them that there were two cash register drawers in front. Johnson ordered Early to retrieve them and stood by the door with the shotgun pointed at her back as she went to get them. Early brought the register drawers back into the office area where Arsbury and Johnson emptied them.

At this point in the robbery there was a knock at the back door. Arsbury ordered Early to answer it and followed her to the back door with his gun pointed at her back. When Early asked who it was, Sergeant William Godbout replied that it was the police. Arsbury took Early back into the office area. Johnson and defendant Williams asked Arsbury who it was and what they were going to do. Arsbury grabbed Early and told her that she was coming with them. Johnson pointed the shotgun at Early and handed the purse with the money to Williams who accepted it. Johnson seized Gail Harmsa and told her to get up and threatened to shoot her if she tried anything. Arsbury asked Early if there was a basement to the building. She said there was none.

At gunpoint, Johnson and Arsbury forced Harmsa and Early to the back door of the restaurant. Defendant Williams followed Johnson and Arsbury. When Arsbury opened the back door, Sergeant Godbout, who was standing behind a 1974 Chevy parked in the back lot, told them to surrender. Arsbury closed the door momentarily, then reopened it. Arsbury forced Early to walk directly in front of him with his pistol in her back. He warned the officer, "I have hostages here, get out of here or we'll kill you, and we'll kill them, too." Arsbury then fired one shot at Godbout which missed him and struck the windshield of the car. Johnson and Harmsa were standing next to Arsbury and Early when Arsbury fired at the officer.

As they proceeded further outside, Arsbury held his pistol to Early's head, and Johnson kept the barrel of his shotgun pressed against Harmsa's back. Defendant Williams followed them. All five walked toward an AMC Gremlin parked in the back lot which Arsbury, Johnson and Williams had borrowed earlier that evening from Loretta Colburn. Williams opened the passenger door and flipped the passenger seat forward so Johnson and Harmsa could get into the back seat. Johnson was pointing his shotgun at Harmsa's head. Arsbury and Early got into the front seat. Arsbury continued to hold his gun to Early's head. Defendant Williams entered the driver's side, started the car and asked Arsbury where she should go. Arsbury told her to drive straight ahead, which was impossible because there were barriers in the way. Instead, Williams pulled out onto Ashland Avenue and tried to maneuver around a squad car which was blocking the street. She struck a parked car, and the Gremlin's engine died. As a result of the accident, Early's head hit the windshield. Arsbury exited from the right side with Early who fell to the ground. Arsbury told her that if she did not get up he would kill her. Arsbury grabbed her and pressed the muzzle of his gun against her head. Arsbury then fired twice at Officer James O'Brien who was standing approximately 18 to 20 feet from him. O'Brien returned the fire.

Johnson ordered Williams to start the car. After Williams succeeded in getting the engine to run, she told Arsbury, "I got it started. Get back in," and Arsbury and Early re-entered the vehicle. Arsbury and Johnson told Williams to put the car in reverse. Williams tried, but the car would not move. Officer Robert Grantman then began to shoot out the car's front tires. When Early said they were being fired upon, Arsbury told her not to worry because the police were aiming at the tires only. Immediately after Arsbury said this, a bullet passed through the driver's side window.

Using a loudspeaker, Officer Robert Grantman three times told the persons in the Gremlin to throw out their weapons and surrender. Arsbury said that they should comply and threw his .32 semiautomatic pistol out of the window. Johnson threw out the sawed-off shotgun. A .22 revolver was also thrown from the vehicle, but none of the officers at the scene could positively state whether he had seen defendant Williams throw any weapon from the vehicle.

After the police had arrested Arsbury, Johnson and Williams, they searched the Gremlin and retrieved $1,331.24 from Early's purse which was found on the driver's side of the front seat floor. Three weapons were recovered—a loaded 16-gauge shotgun, a five-shot .22 revolver which had not been fired, and a .32 Colt semiautomatic pistol with six shots left in the magazine. The automatic was capable of holding one round in the chamber and eight additional rounds in the magazine. One expended .32 casing was found by the rear of the Burger King. Expert testimony

established that the casing had been ejected from Arsbury's .32 automatic. During the course of the robbery, Arsbury was wearing a wig, and both Arsbury and Johnson were wearing rubber gloves.

Testifying in her own defense, Williams stated that she had accompanied Johnson and Arsbury to the Burger King restaurant but did not know that the two men had planned an armed robbery and "froze" when Johnson produced a sawed-off shotgun. Defendant stood in the corner of the restaurant during the robbery and did not take any money. Defendant said that she obeyed every order that Johnson and Arsbury gave her. In the back office area Johnson pointed his shotgun at everyone, including defendant. She denied that Arsbury told her to watch the employees when Arsbury and Early went to the front of the restaurant or that she agreed to do so. Defendant also denied asking Early why she was turning off the lights in the restaurant. Arsbury told defendant that she was "going to drive" and she left the restaurant. When Arsbury said this, he had a weapon in his hand but it was not pointed directly at defendant. Arsbury, Johnson, Williams, Harmsa and Early got into the Gremlin. At this point in her testimony the following exchange took place:

"[Defense Counsel]: What did you think they would do to you if you said you wouldn't drive?

[Prosecutor]: Objection to what she thought.

The Court: Sustained.

[Defense Counsel]: The mental state is important. It's a certain intent crime.

[Prosecutor]: What she thought what somebody else was going to do?

The Court: The question, as stated, is vague. I understand the purpose of the question.

[Defense Counsel]: Okay. After you were instructed to drive that car, did you get behind the wheel and drive that car?"

Defendant testified further that she began to drive the vehicle but ran into another automobile. She exited the Gremlin when the police arrived. Defendant stated that she did not intentionally and knowingly commit the crime of armed robbery.

On cross-examination defendant testified that it was her suggestion to stop at the Burger King. She denied ever touching Early's purse. Defendant admitted that during the course of the robbery she never got down on the floor with Harmsa and the employees. Neither Arsbury nor Johnson pointed a gun directly at her. Defendant did not tell Arsbury or Johnson that she did not want any part of the robbery and never asked to leave.

The jury found defendant Williams guilty of armed robbery. Her co-defendant, Michael Johnson, was found guilty of both counts of unlawful restraint, unlawful use of weapons and armed robbery. After a

hearing in aggravation and mitigation, defendant Williams was sentenced to serve nine years in the Department of Corrections.

## I

Defendant contends that her conviction must be reversed because the trial court failed to give the complete Illinois Pattern Jury Instruction on the presumption of innocence and the State's burden of proof. IPI Criminal No. 2.03 reads as follows:

> "[The] [Each] defendant is presumed to be innocent of the charge[s] against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty.
>
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

In the case at bar the State submitted and the trial court read only the first paragraph of this instruction to the jury. Defendant claims that the court's failure to read the second paragraph requires reversal of her conviction. The State contends that the instruction given, when considered together with the remarks of counsel and the trial judge concerning the State's burden of proof, adequately informed the jury of defendant's presumption of innocence and the State's burden of proof. The State contends further that under the circumstances of this case any defect in the instruction was insubstantial and may not be reviewed on appeal because defendant failed to object to it at trial.

■■ Defendant did not object to the instruction when it was offered by the State at the conference on instructions nor did she ask that the instruction be given in its entirety. Defendant did not raise this issue in her post-trial motions. Nevertheless, we do not believe defendant's failure to offer the complete instruction bars review of her argument on appeal. Even in the absence of a defense request, the trial court bears the responsibility of seeing that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof. (*People v. Parks* (1976), 65 Ill. 2d 132, 137, 357 N.E.2d 487.) The failure to give the IPI instruction on the presumption of innocence and reasonable doubt has been held to constitute reversible error. (*People v. French* (1972), 5 Ill. App. 3d 908, 909, 284 N.E.2d 481; *People v. Donald* (1974), 21 Ill. App. 3d 696, 701, 315 N.E.2d 904.) However, although the Committee Note to IPI Criminal No. 2.03 states

that the instruction "*must* be given in *all* cases" (emphasis from IPI), both *French* and *Donald* expressly refrained from deciding whether it is reversible error not to give this instruction in *any* case. In *French*, the court held that reversal was required "where the presumption of innocence was not mentioned in any instruction or in any argument to the jury, * * *." (5 Ill. App. 3d 908, 909.) In the case at bar, the jury was instructed as to the presumption of innocence but was not properly instructed on the State's burden of proof and on the principle that the defendant need not prove her innocence.

The question presented by this record, therefore, is whether the omission of the second paragraph of IPI Criminal No. 2.03 requires reversal of defendant's conviction. The identical question was resolved adversely to defendant's position in *People v. Cesarz* (1969), 44 Ill. 2d 180, 189, 255 N.E.2d 1, not cited by either party. There the trial court instructed the jury as it did here, failing to include the second paragraph of IPI Criminal No. 2.03. In a per curiam opinion the supreme court held (Schaeffer, J., dissenting) that it was not reversible error not to give the second paragraph: "The committee note [to IPI Criminal No. 2.03] refers to the presumption of innocence which can be overcome only by proof beyond a reasonable doubt. This legal premise was set forth in the instruction as given and we believe that the jury was adequately instructed." *Cesarz*, at 190.

■■ In the case at bar, the instructions read to the jury were prepared by the State. We find the omission of the second paragraph of IPI Criminal No. 2.03 inexplicable and do not expect to see a repetition of this error in other cases. While we do not approve of the trial court's inadvertent failure to read IPI Criminal No. 2.03 in its entirety to the jury and agree that a refusal to instruct the jury as to either paragraph of the instruction would constitute reversible error (*Donald; People v. Schultz-Knighten* (1917), 277 Ill. 238, 243, 115 N.E. 140; *People v. Rongetti* (1929), 338 Ill. 56, 66, 170 N.E. 14; *People v. Long* (1950), 407 Ill. 210, 213-14, 95 N.E.2d 461), we believe that the supreme court's opinion in *Cesarz* is controlling[1] and disposes of defendant's contention.

---

[1] Although the trial in *Cesarz* took place before the effective date of the pattern jury instructions (January 1, 1969), we cannot consider this a distinguishing factor in light of the supreme court's specific reference to IPI Criminal No. 2.03. Moreover, we reject defendant's contention that *Cesarz* was overruled *sub silentio* in *People v. Parks* (1976), 65 Ill. 2d 132, 357 N.E.2d 487. In *Parks* the supreme court stated that even in the absence of a defense request, the trial court is responsible for seeing that the jury is instructed on the presumption of innocence and on the question of burden of proof. (*Parks*, at 137.) We do not believe that by these comments the supreme court intended to overrule *Cesarz* and note that on two occasions after *Parks* was decided, the supreme court has cited *Cesarz* without indicating any disapproval of the result reached in that case. See *People v. Roberts* (1979), 75 Ill. 2d 1, 12, 387 N.E.2d 331; *People v. Smith* (1978), 71 Ill. 2d 95, 104, 374 N.E.2d 472.

## II

Defendant next contends that the trial court erred in not instructing the jury on the affirmative defense of compulsion. (Ill. Rev. Stat. 1977, ch. 38, par. 7—11.) The State, pointing to defendant's testimony that during the course of the robbery she merely "stood there" and did not have a gun in her possession or take any money, argues that "the defense of compulsion is not relevant where, as in the case at bar, a defendant's defense is that she was not a participant, either willingly or unwillingly, in the crime." While it is true that defendant denied participating in the robbery itself, she also testified that she was ordered to drive the vehicle in which Arsbury and Johnson were attempting to flee.

It is clear that if a person knowingly drives a "getaway car" from the scene of a crime, he may be held legally responsible as a principal. (*People v. Richardson* (1971), 132 Ill. App. 2d 712, 714, 270 N.E.2d 568.) If there is evidence that a defendant was compelled to drive a "getaway car," then the defense of compulsion may become relevant. Section 7—11 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 7—11) provides:

> "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

At the conference on instructions defense counsel asked the trial court regarding an instruction on compulsion. Although there are two *Illinois Pattern Jury Instructions* dealing with the affirmative defense of compulsion (IPI Criminal Nos. 24.21 and 25.06), neither the trial court nor defense counsel expressed familiarity with either instruction. After the trial court erroneously advised counsel that there was no compulsion instruction, counsel stated that he would simply argue the issue to the jury without the benefit of an instruction. Defendant now claims that the trial court's failure to instruct the jury *sua sponte* on the defense of compulsion was reversible error.

Initially it must be observed that the fact that neither defense counsel nor the trial court was aware of the IPI instructions on compulsion did not preclude counsel from submitting his own instruction as long as it contained an accurate statement of the law. (Ill. Rev. Stat. 1977, ch. 110A, par. 451.) Defendant, however, offered no instruction on this issue and it is well settled that for an instruction to be tendered to the jury on a particular point, it is the duty of the defendant to prepare and ask for the instruction. A trial judge has no duty to give instructions *sua sponte* where a defendant does not tender them, and a defendant cannot complain upon review that an instruction was not given when he never tendered that

instruction at trial. *People v. Nutall* (1980), 91 Ill. App. 3d 758, 765, 415 N.E.2d 628; *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180, 415 N.E.2d 1027.

■■ A limited exception to this waiver rule appears in Rule 451(c) (Ill. Rev. Stat. 1977, ch. 110A, par. 451(c)) which permits the review of "substantial defects" in instructions "if the interests of justice require." This exception has been narrowly restricted to correct "grave errors" (*People v. Jenkins* (1977), 69 Ill. 2d 61, 66, 370 N.E.2d 532) or to be applied where the case is close factually and fundamental fairness requires that the jury be properly instructed (*People v. Joyner* (1972), 50 Ill. 2d 302, 307, 278 N.E.2d 756). We are not convinced that this case is "close factually" nor do we believe the failure to instruct on compulsion constituted grave error.

In *People v. Unger* (1977), 66 Ill. 2d 333, 339, 362 N.E.2d 319, our supreme court held that "the defense of compulsion generally requires an impending, imminent threat of great bodily harm together with a demand that the person perform the specific criminal act for which he is eventually charged." (See also *People v. Ricker* (1970), 45 Ill. 2d 562, 569, 262 N.E.2d 456.) Here, although there was testimony that Arsbury and Johnson directed defendant's activities during the robbery and ordered defendant to drive the getaway car, there was no evidence that either Arsbury or Johnson had threatened defendant with death or serious physical harm if she refused to cooperate or that defendant reasonably believed that death or harm would be inflicted if she refused. The conduct defendant related at trial did not establish the defense of compulsion. *People v. Robinson* (1976), 41 Ill. App. 3d 526, 529, 354 N.E.2d 117.

■■ The defense of compulsion is an affirmative defense which the State need not disprove unless the defendant has introduced sufficient evidence of compulsion to raise an issue of fact creating a reasonable doubt as to the defendant's guilt. (Ill. Rev. Stat. 1977, ch. 38, par. 3—2; *People v. Redmond* (1974), 59 Ill. 2d 328, 337-38, 320 N.E.2d 321; *People v. Gray* (1980), 87 Ill. App. 3d 142, 150, 408 N.E.2d 1150.) As in *Gray*:

> "* * * in the absence of any threat of the imminent infliction of death or great bodily harm or the reasonable belief that such would be inflicted if she did not participate, we find also that the quantum of evidence necessary to raise the affirmative defense of compulsion was lacking. In the light thereof, we hold that an instruction on compulsion would not have been warranted even if it had been offered by defendant." 87 Ill. App. 3d 142, 150.

The trial court did not err in not submitting on its own motion an instruction on the affirmative defense of compulsion.

## III

Defendant contends that the trial court improperly denied her the right to testify as to her state of mind during the course of the robbery. On direct examination defendant was asked, "What did you think they would do to you if you said you wouldn't drive?" The trial court sustained the State's objection commenting, "The question, as stated, is vague. I understand the purpose of the question." Defendant argues that the question was not vague and that it was prejudicial to sustain the objection where testimony regarding defendant's thoughts was material to her defense of compulsion. The State responds that the question was vague and that, in any event, defense counsel was not foreclosed from rephrasing the question.

■■ We do not agree with the State's contention that the question was vague. Immediately before asking the question, defense counsel asked defendant if the other two individuals (Arsbury and Johnson) had hostages with them. In the context of the examination we do not believe that the next question regarding what defendant thought "they" would do if she refused to drive the car was vague. While the trial court should have overruled the State's objection since defendant's thoughts were germane to her defense (see *People v. Biella* (1940), 374 Ill. 87, 89-90, 28 N.E.2d 111), reversible error was not committed because it is clear from the trial court's comments in sustaining the objection that defense counsel was not precluded from rephrasing the question with more specificity. As in *People v. Sails* (1971), 133 Ill. App. 2d 287, 292, 273 N.E.2d 188, cited by the State, "[a]lthough the objections should have been overruled, the defendant cannot sustain a charge of unfairness when he would have been permitted to answer the questions if his counsel had asked them again in a different way." Here defense counsel did not rephrase the question. While defendant contends that defense counsel's failure to pursue this line of questioning is evidence of actual incompetence, on the basis of the record before us we are unable to concur.

## IV

Defendant next contends that the trial court erred by not including in the armed robbery instruction the requirements of accountability. The State responds that defendant's argument is predicated upon the erroneous assumption that the State was proceeding against defendant solely on an accountability theory. Moreover, even assuming that such assumption is correct, the State maintains that the instructions, when read in their entirety, adequately instructed the jury and that any error was waived by defendant's failure to object to the separate instructions on the elements of armed robbery and accountability.

The Illinois Pattern Jury Instructions do not suggest incorporating the

language of the accountability instruction (IPI Criminal No. 5.03) into the issues instruction where the State is proceeding solely on a theory of accountability. Nevertheless, cases decided both before and after adoption of the pattern instructions on January 1, 1969, recommend inclusion of the accountability language in the issues instruction to clarify the principle of accountability and assist the jury in their deliberations. See *People v. Lehner* (1929), 335 Ill. 424, 430, 167 N.E. 20; *People v. Hatfield* (1972), 5 Ill. App. 3d 996, 1002, 284 N.E.2d 708; *People v. Grashoff* (1974), 21 Ill. App. 3d 282, 286, 315 N.E.2d 209; *People v. Comer* (1979), 78 Ill. App. 3d 914, 916, 397 N.E.2d 929.

■■ In the case at bar, however, the State introduced some evidence that defendant acted as a principal in the armed robbery. Where there is evidence to show participation as principal or the participation and assistance in the commission of the offense, the State is entitled to instructions on both theories. (*People v. Crocker* (1978), 58 Ill. App. 3d 328, 330, 373 N.E.2d 621.) Even if there had been no evidence that defendant had acted as a principal in the robbery, the trial court is not required to submit a combined accountability and issues instruction on its own motion where defense counsel has not requested one. (*Grashoff*, at 286-87; *Crocker*, at 330.) Furthermore, our research has not disclosed any case in which a conviction was reversed on the grounds defendant now raises. We do not believe defendant suffered any substantial prejudice by the separate instructions given on accountability and the issues in armed robbery.

## V

As an alternative to a new trial defendant asks that her case be remanded for resentencing on three grounds. First, defendant contends that the trial court improperly relied on her record of bond forfeitures in imposing sentence. Defendant asserts that since none of the bond forfeiture warrants ever resulted in criminal charges for bail jumping, the warrants themselves have no more status than mere arrests and, therefore, may not be considered in sentencing.

■■ We cannot accept defendant's analogy of bond forfeitures to arrests. The fact that a defendant does not appear in court when she is required to do so as a condition of her bond indicates a disrespect for the law (*People v. McGowan* (1970), 131 Ill. App. 2d 313, 266 N.E.2d 475) and, in the absence of a satisfactory explanation for the forfeiture, may be taken into account by the trial court at a hearing in aggravation and mitigation. Such conduct may reflect on a defendant's general moral character which is a proper area of inquiry by the trial court. (*People v. Dukett* (1974), 56 Ill. 2d 432, 452, 308 N.E.2d 590; *People v. Stoutenborough* (1978), 64 Ill. App. 3d 489, 493, 381 N.E.2d 415.) Defendant's argument that only a conviction

for bail jumping may be considered proof of a bond forfeiture is misplaced. So long as a person who jumps bail surrenders himself within 30 days of the forfeiture, he may not be prosecuted for bail jumping. (Ill. Rev. Stat. 1981, ch. 38, par. 32—10.) Defendant also points out that she advised the trial court through her counsel that "she was incarcerated a good number of those times, which were the reason for the bond forfeiture." Defense counsel did not offer any evidence in support of this bare allegation, and in lieu of any testimony or documentation we cannot say that the trial court's consideration of at least some of the bond forfeitures in imposing sentence was improper or prejudicial.

Defendant next contends that the trial court improperly inferred that defendant indicated a lack of remorse. The presentence investigation report included a statement attributed to defendant that, "She wonders how she could be found guilty of Armed Robbery which she says is the conviction, instead of Attempted Murder when she was found not guilty of Unlawful Use of a Weapon." In sentencing defendant the trial court expressed the belief that "the defendant evidently shows no remorse. All she indicates is that she just wonders how she was found guilty of armed robbery when the other charges were not guilty." Again, before imposing sentence, the court stated, "I see really no sign of remorse here, * * *."

■■ Defendant acknowledges that in imposing sentence the trial court may consider a defendant's lack of remorse (*People v. Morgan* (1974), 59 Ill. 2d 276, 282, 319 N.E.2d 764), but argues that the court improperly drew this inference from what defendant now contends was merely a "justifiable question concerning the consistency of the verdicts, * * *." We are unable to concur with defendant's interpretation of the trial court's remarks. While it may be true, as counsel suggests on appeal, that defendant was merely commenting on what she regarded as inconsistent verdicts, we do not believe the trial court inferred a lack of remorse from the comments themselves. Rather, the court merely stated that defendant had not indicated any remorse when in fact she had not. We find no error in this.

■■ Finally, defendant complains that in sentencing defendant the trial court relied on defendant's use of aliases which defendant contends is proscribed by *People v. Berlin* (1979), 75 Ill. 2d 266, 268, 388 N.E.2d 412. We need not decide whether *Berlin* is authority for this proposition because, in our judgment, defendant had misapprehended the thrust of the trial court's remarks. Nowhere did the court rely on defendant's use of aliases as an aggravating factor in itself. The court simply observed that the use of the aliases may have explained the large number of bond forfeiture warrants which had been issued against defendant. We do not perceive any prejudice to defendant in these remarks.

Upon our review of the sentencing hearing, we find no evidence that

the trial court took into account any improper factors in imposing sentence. Nor do we find that the sentence imposed was an abuse of discretion. We therefore decline to remand for a new sentencing hearing. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

For the foregoing reasons we affirm the judgment of the circuit court of Cook County and the sentence imposed thereon.

Affirmed.

STAMOS and DOWNING, JJ., concur.